LAW OFFICE OF ANTHONY CECUTTI
217 Broadway, Suite 707
New York, New York 10007
Phone: (212) 619-3730
Cell: (917) 741-1837
anthonycecutti@gmail.com


March 17, 2026

**BY ECF**
The Honorable J. Paul Oetken
United States District Court Judge
Southern District of New York
40 Foley Square
New York, New York 10007

## SENTENCING MEMORANDUM

**Re: United States v. Derian Del Carmen; 24 Cr. 601 (JPO)**

Dear Judge Oetken:

Derian Del Carmen, who recently turned 30 years old, is on the right path. A son and father, Derian has struggled with serious mental health conditions and substance abuse for years. Such struggles contributed to him returning to selling drugs shortly after he was released from federal prison in 2024. However, after a brutal and harsh incarceration at MDC Brooklyn, Derian was transferred to Hudson County Correctional Center ("HCCC"). There, he participated in substance abuse and mental health treatment at Integrity House, a residential program. And not only did he participate. He rose to a leadership position and achieved the highest level of treatment. In so doing, Derian found healing. Furthermore, he experienced transformation. Critically, he discovered hope for himself, and for a better tomorrow with his son and family.

We urge Your Honor to consider Derian's offense in the context of his history of trauma, substance abuse and lifelong struggles with mental illness before imposing sentence, along with his transformative rehabilitative efforts through his participation in Integrity House. *See Pepper v. United States*, 131 S. Ct. 1229, 1240 (2011) (recognizing the underlying principle of sentencing is that "the punishment should fit the offender and not merely the crime."); *Pennsylvania ex rel. Sullivan v. Ashe*, 302 U.S. 51, 55 (1937) ("For the determination of sentences, justice generally requires consideration of more than the particular acts by which the crime was committed and that there be taken into account the circumstances of the offense together with the character and propensities of the offender."). Additionally, it is our hope that what follows in this memorandum and what is discussed in the attached mitigation report by Lisa Orloff, LMSW, ACSW, *see* Exhibit "A," the attached psychological assessment by Dr. Sanford L. Drob, Ph.D., *see* Exhibit "B," and the letters from Derian's family, *see* Exhibit "C," provides the Court with a rich understanding of Derian, the trauma and challenges he has endured and is working to overcome, and the person and man he is determined to become through his commitment to rehabilitation and fortitude to live

1

differently, so that it can impose a sentence that is "sufficient, but not greater than necessary." We respectfully submit that a total sentence of 120 months' imprisonment, with 5 years' supervised release, is "sufficient but not greater than necessary," based on a consideration of the factors set forth in 18 U.S.C. § 3553(a).[1]

**Derian Del Carmen's Life History – Abuse, Trauma and Transformation**

As indicated, mitigation specialist, Lisa Orloff, LMSW, ACSW, prepared a detailed report that describes Derian's life history and background, and transformation at HCCC through substance abuse and mental health treatment at Integrity House, for the Court's consideration. *See* Exhibit "A" (Mitigation Report). Dr. Drob also prepared a psychological assessment describing Derian's mental health conditions and recommendations for continued treatment. *See* Exhibit "B" (Psychological Assessment).



However, Derian's past and involvement in the instant offense is not the end of the story. Through his participation in mental health and substance abuse treatment at Integrity House, Derian has attained sobriety, been productive, gained insight and not had a single infraction.

**Derian Del Carmen's Participation in the Instant Offense**

Upon his release from prison in January 2024, Derian struggled with re-entry to his community. He turned to using marijuana to manage his anxiety. Later, he began using opioids and increased his marijuana use, to quiet his anxiety. He turned to others who were selling various kinds of narcotics. He began selling crack cocaine to make money and support his own substance use. Shortly before he was re-arrested, two of his friends were stabbed within the span of twenty-four hours and one of these friends later passed away because of his injuries. Like many people facing similar circumstances, these events pushed Derian further into heavy drug usage to cope with his emotions and fear. Derian's arrest on July 17, 2024 was an inflection point on his downward spiral.

---

[1] Derian also has a pending VOSR. Our request is that the Court impose a total sentence of 120 months' imprisonment - for the instant offense and the VOSR. On June 24, 2025, he pled guilty to the instant offense and violating his supervision.

**Derian Del Carmen's Incarceration Under Inhumane Conditions at MDC Brooklyn and Transformation Through Participation in Treatment at Integrity House at HCCC Supports a Sentence of 120 Months' Imprisonment**

Following his arrest, Derian was detained at MDC Brooklyn.   There, and for 11 months, he was further traumatized by the regular occurrence of chaos and violence and lack of adequate mental health care.

The horrific conditions at MDC that Derian endured are well-documented. In a 2024 opinion, the Honorable Jesse M. Furman described the "near-perpetual lockdowns," "dreadful conditions," and "lengthy delays in getting medical care." *See United States v. Chavez*, 22 Cr. 303 (S.D.N.Y. January 4, 2024). Citing numerous cases, he further stated, "Contraband – from drugs to cell phones – is widespread. At least four people in MDC custody have died by suicide in the past three years. It has gotten to the point that it is routine for judges in both this District and the Eastern District to give reduced sentences to defendants based on the conditions of confinement in the MDC. Prosecutors no longer even put up a fight, let alone dispute that the state of affairs is unacceptable." *See id.* at 2-3.  In August 2024, in another opinion, the Honorable Gary R. Brown, stated,

> Most judges would agree that, under ordinary circumstances, sentencing represents their most difficult and complex responsibility: after considering the advisory United States Sentencing Guidelines, a broad array of statutory factors must be carefully applied to the factual circumstances of each case and tailored to the individual defendant in an effort to effect justice and the statutory requisites. In this case, the determination is further complicated by an extrinsic factor that looms large in nearly every bail and sentencing determination made in this judicial district: *the dangerous, barbaric conditions that have existed for some time at the Metropolitan Detention Center ("MDC") in Brooklyn* (emphasis added).

*United States v. Colucci*, 23 Cr. 417 (E.D.N.Y. Aug. 5, 2024).

Judge Brown further stated, "[c]haos reigns, along with uncontrolled violence." Describing the "catastrophic violence," he detailed various acts of violence – two murders, two "gruesome" stabbings and an assault ("so severe that it resulted in a fractured eye socket for the victim") related to drug debt collections, disputes over drugs and gang disputes.  "These incidents demonstrate a woeful lack of supervision over the facility, a breakdown of order and an environment of lawlessness within its confines that constitute unacceptable, reprehensible and deadly mismanagement.  And these conditions bear heavily on the determination by the Court in this case."

On April 27, 2024, a person in custody at MDC was brutally stabbed 44 times in a shocking incident captured on video. The footage reveals the slow response time from a lone correction officer, underscoring the dangerous environment in which people at MDC are confined.[2]  Later,

---

[2] *See* https://www.nydailynews.com/2024/07/27/see-it-video-from-inside-troubled-brooklyn-federal-jail-mdc-shows-brutal-gang-stabbing/.

on August 27, 2024, a person in MDC custody was stabbed in the spine with a makeshift icepick, leaving the icepick protruding from the inmate's back.  He had to be transported to the hospital for the icepick to be removed and to be treated for other injuries.  Tragically, other people jailed at MDC have not been as fortunate. On June 7, 2024, Uriel Whyte was stabbed to death, and just a month later, on July 17 (the same day Derian was arrested and then detained at MDC Brooklyn), Edwin Cordero was killed after a fight broke out in the facility. Andrew Dalak, a lawyer from Federal Defenders representing Mr. Cordero, called his client's death "senseless and completely preventable," while adding that Mr. Cordero was "another victim of M.D.C. Brooklyn, an overcrowded, understaffed and neglected federal jail that is *hell on earth*."[3]

Derian's time at MDC was defined by inhumane conditions.  This included pervasive lockdowns, sporadic contact with his family by phone and social visits, and constant exposure to violence.  As a result, Derian unnecessarily suffered mentally and emotionally.

Derian's mental health plummeted after his arrest on July 17, 2024.  His constant exposure to violence at MDC Brooklyn exacerbated his ongoing mental health struggles. As Derian put plainly in a letter to the Court prior to a bail hearing, "I'm constantly afraid. I'm afraid of seeing something happen to someone or something happening to me." Several times, he was denied his medication for anxiety, resulting in periods of intense anxiety, and suicidal ideation.  The most mental health treatment Derian received at MDC Brooklyn was a monthly 10-minute visit with someone from Psychology Services.  His requests to meet with Psychology regularly were denied. The same was true of his requests for additional mental health medication and participation in a substance abuse program – NRDAP.  All his requests for increased mental health treatment were either ignored or denied by MDC Brooklyn medical staff.

On April 5, 2025, Derian was assaulted and pepper-sprayed by multiple guards in his cell, and brought to the SHU.  He suffered numerous injuries during this assault, including: an injury to his nose, severe bruising to his upper left arm, severe bruising to his lower back, injury to his head, jaw pain, and other injuries.  After an investigation by MDC staff and ongoing bail litigation, Derian was transferred to HCCC on May 8, 2025.

Upon his transfer to HCCC, Derian was in a different environment.  He learned that within HCCC existed an intensive inpatient mental health and substance abuse program – Integrity House. Derian informed that staff that he wanted to participate in the program.  In October, 2025, he was evaluated and accepted.  Over the course of nearly 6 months, Derian dedicated himself to treatment.  Through hard work and daily dedication and commitment, he rose to a leadership position and reached Phase "A," the highest level of treatment.  And in so doing, experienced newfound healing, growth and transformation.

---

[3] *See* https://www.nytimes.com/2024/07/17/nyregion/inmate-dies-metropolitan-detention-center.html.

**Derian Del Carmen's Acceptance of Responsibility, Procedural History and Sentencing Guidelines Analysis**

On June 24, 2025, Derian, in the presence and support of his family, pled guilty before Your Honor to a one-count felony superseding information pursuant to a plea agreement. It charged him with participating in a crack-cocaine conspiracy from January 2024 through July 2024. The stipulated advisory Guidelines Range in the plea agreement is 108 to 135 months' imprisonment. However, since Derian pled guilty to a drug offense with a ten-year mandatory minimum sentence, the Guidelines Range is 120 to 135 months' imprisonment.[4]

Derian accepts responsibility for his actions. He expressed this, along with how he let down himself and his family, and commitment to his well-being and sobriety through participation in treatment and programs. During the plea proceeding, Derian told Your Honor,

> I accept my full responsibility for my wrongdoing. I am sorry to my family, especially my mother and son. I want to be better. I am committed to doing all I can to be better with my mental health and stop using drugs. I intend to do any programs and classes that will help me to live responsibly when I am released. And at my sentencing, I hope that your Honor will have leniency on me and give me a chance to be a better person.

*See* Presentence Report ("PSR") at ¶ 20.

On November 12, 2025, Probation disclosed its final PSR. Probation identified several mitigating factors pursuant to 18 U.S.C. § 3553(a) that may warrant a sentence below the Sentencing Guidelines Range. These factors included Derian's difficulties during his childhood, including witnessing violence in his household between his mother and father; his parents' separation when he was ten years old and limited contact with his father thereafter; struggles with mental health issues from a young age; financial hardship; and having family support. Ultimately, Probation recommended a total sentence of 120 months' imprisonment and five years' supervised release, stating that such a sentence was reasonable and would address all the purposes of sentencing. We agree.

\*        \*        \*

Sentencing courts must "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue."[5] Further, it must not presume the Guidelines as reasonable or be restricted or bound by the Guidelines Range.[6] As such, a sentencing court must conduct an

---

[4] The stipulated advisory Guidelines Range in the plea agreement for the violation is 27 to 33 months.

[5] *Pepper v. United States*, 562 U.S. 476 (2011) (*quoting Koon v. United States*, 518 US 81, 113 (1996)).

[6] *See Nelson v. United States*, 550 U.S. 350, 351 (2009); *see also United States v. Dorvee*, 604 F.3d 84, 93 (2d Cir. 2010) ("[i]n conducting this review [of the § 3553(a) sentencing factors], a district court needs to be mindful of the fact that it is 'emphatically clear' that the Guidelines are guidelines – that is, they are truly advisory'"), *quoting*

"independent review of the sentencing factors" in all cases for each defendant.[7] The aim is to fashion a sentence that is "sufficient, but not greater than necessary," based on an analysis of the § 3553(a) factors as they pertain to a particular individual offender, such as the purposes of sentencing, including, punishment, deterrence, incapacitation and treatment and rehabilitation, and consideration of the individual offender and his life history and background.  This conforms with 18 U.S.C. § 3661, which provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."[8]  In *Pepper*, the Supreme Court cited § 3661 as an important means of achieving just sentences: "[p]ermitting sentencing courts to consider the widest possible breadth of information about a defendant 'ensures that the punishment will suit not merely the offense but the individual defendant.'"[9]

As this Court is well aware, *United States v. Booker*, 543 U.S. 220 (2005), and its progeny provide this Court the authority to vary from a strict application of the Guidelines.  A substantial downward variance from the Guidelines is warranted in this case, based on the individualized assessment and consideration of the § 3553(a) factors as applied to Derian.  The Guidelines Range is primarily constructed by and driven by aggravating factors, using points and numbers. Mitigating factors are not part of the Guidelines calculation.   Further, the sentence of Derian, or any individual, should not be left to an algorithm, enhancements, points, or mathematical formula. "No chart of numbers will ever fully contemplate, quantify and cipher the endless variations of the human experience.  While it might provide a normalizing force in sentencing, we cannot, with a system of points and categories, reduce justice to a universal formula."[10]  Rather, the aim must be to impose a sentence that is fair and just given the particular facts of this case and the facts relative to Derian, and consistent with the purposes of sentencing.

---

*United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (requiring district courts not to presume that a Guidelines sentence is reasonable for any particular defendant).

[7] *See id.*

[8] Likewise, in 21 U.S.C. § 850, which specifically pertains to narcotics offenses and their penalties, Congress further determined that "… no limitation should be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence …" 21 U.S.C. § 850.  *See also United States v. Murillo*, 902 F.2d 1169, 1172 (5th Cir. 1990).

[9] 562 U.S. at 488, *quoting Wasman v. United States*, 468 U.S. 559, 564 (1984); *see also Gall v. United States*, 552 U.S. 38, 50 (2007) (sentencing courts must consider any and all information relating to the background, character and conduct of the defendant, in order to "make an individualized assessment based on the facts presented"); *See also Cavera*, 550 F.3d at 189 (2d Cir. 2008) (en banc) (requiring district courts to conduct an "independent review of the sentencing factors" in all cases); *Gall*, 552 U.S. at 50 (sentencing courts must consider any and all information relating to the background, character and conduct of the defendant, in order to "make an individualized assessment based on the facts presented"); *United States v. Johnson*, 567 F.3d 40, 50-51 (2d Cir. 2009) (same).

[10] *United States v. Coughlin*, 2008 WL 313099 (W.D. Ark. Feb. 1, 2008).

With the focus on numbers, the Guidelines can become a gravitational pull on the ultimate sentence. This has been described by academic scholars as the "anchoring effect."[11]   The "anchoring effect" is recognized by psychologists as a cognitive shortcut that has a strong tendency to undermine judgments in making difficult and complex decisions. Through an earlier disclosed number, the "anchor," the judgment of a decision-maker is influenced.  Although *Booker* granted judges great discretion, sentences are often "anchored" by the particular Guidelines Range in a case. The Honorable Jed S. Rakoff described the phenomenon of the "anchoring effect" of the Guidelines as follows: "[T]he very first thing a judge is still required to do at sentencing is to calculate the Guideline range, and that creates a kind of psychological presumption from which most judges are hesitant to deviate too far."[12]   We urge the Court to be mindful of such "psychological presumption."  Additionally, while the Guidelines are the "starting point," and the Court must consider, Derian's sentence should not be directly derived from a mathematical analysis.  Rather, it should be based on an individualized assessment of all the § 3553(a) factors.

As stated, and as this Court is also well aware, the overarching goal in any case is to fashion a sentence that is "sufficient, but not greater than necessary."  And "[w]hile there are many competing considerations in every sentencing decision, a sentencing judge must have some understanding of 'the diverse frailties of humankind,' and a 'generosity of spirit, that compassion which causes one to know what it is like to be in trouble and in pain."[13]  Mercy too, *must* play a role in determining a just and fair individualized sentence (emphasis added).[14]  For the reasons set forth in this memorandum, a sentence well below the Guidelines is more than "sufficient, but not greater than necessary" for Derian Del Carmen.

**Analysis of the Purposes of Sentencing as they Relate to Derian Del Carmen Further Favors a Total Sentence of 120 Months' Imprisonment**

Pursuant to § 3553(a), the Court must consider the purposes of sentencing, including "just punishment," deterrence, recidivism and incapacitation as they relate to Derian Del Carmen.

---

[11] *See* Mark W. Bennett, *Confronting Cognitive "Anchoring Effect" and "Blind Spot" Biases in Federal Sentencing: A Modest Solution for Reforming a Fundamental Flaw,* 104 J. Crim. L. & Criminology 101, 132 (2014) (*citing United States v. Newhouse*, 919 F. Supp. 2d 955, 958 n.1 (N.D. Iowa 2013) (Bennett, J.). "Comprehensive data from the USSC establishes that the [post-*Booker/Gall*] discretion has, for the most part, had a surprisingly limited impact on federal sentencing. This is due primarily to the robust anchoring impact of first computing the advisory Guideline range before considering the other non-numerical § 3553(a) sentencing factors." *Id.* at 533-534. *See also*, *United States v. Ingram*, 721 F.3d 35, 40 (2d Cir. 2013) (Calabresi, J., concurring) (discussing how "anchoring effects" influence judgments and noting that the court "cannot be confident that judges who begin" at a higher guideline range "would end up reaching the same 'appropriate' sentence they would have reached" if they started from a lower guideline range). *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1353 n. 6, (2016) (Alito, J concurring in part) (Noting the "anchoring" effect of Guidelines).

[12] Hon. Jed S. Rakoff, *Why the Federal Sentencing Guidelines Should be Scrapped*, 26 Fed. Sent'g 6, 8 (Oct. 1, 2013).

[13] *United States v. Singh*, 877 F.3d 107, 121 (2d Cir. 2017).

[14] *United States v. Kloda*, 133 F. Supp. 2d 345, 349 (S.D.N.Y. 2001).

### a.  "Just Punishment"

Section 3553(a)(2)(A) requires a sentencing judge to consider "the need for the sentence imposed … to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."

There is no question that Derian committed a serious offense, did so shortly after being released from prison and that he must be held accountable.  He accepts that he will receive a sentence of at least ten years' incarceration and endure the consequences that will follow, including years of separation from his mother, son and family.  However, "just punishment" must be tempered based on the significant mitigating factors in this case, in particular, Derian's exceptional efforts while at Integrity House that has brought about real and lasting change and transformation. Additionally, Derian's pre-trial experience of incarceration at MDC Brooklyn must also be factored.  Until he was transferred to HCCC, he suffered brutal and harsh conditions and an assault by staff, and received grossly inadequate mental health treatment, which exacerbated his trauma symptoms.

### b.  Deterrence, Recidivism and Incapacitation

Section 3553(a)(2)(B) requires a sentencing judge to consider "the need for the sentence imposed . . . to afford adequate deterrence to criminal conduct."  Here, in this case, for Derian Del Carmen, a total sentence of 120 months' imprisonment more than satisfies the sentencing purpose of deterrence, both specific and general.

With respect to the need for a sentence to afford adequate deterrence to criminal conduct, we doubt that the imposition of a total sentence greater than 120 months, will have *any* bearing on deterrence and we are not aware of any empirical data establishing that it would.  The data is to the contrary.  There simply is no evidence that increases in sentence length reduce crime through deterrence.[15]

In *United States v. Bannister*, 786 F. Supp. 2d 617 (E.D.N.Y. 2011), the Honorable Jack B. Weinstein determined that specific deterrence is not accomplished by lengthy incarceration. Unnecessary prison sentences aimed at specific deterrence promote higher rates of recidivism. During such sentences, a person loses positive and constructive family and social supports, gains negative influences, and is precluded from educational, employment, and rehabilitative  opportunities. Prison is limited in efficacy. Many of the defining features of incarceration are linked to negative health outcomes, including disconnection from family, loss of autonomy, lack of purpose, and unpredictability of surroundings. Professor Craig Haney, an expert on the psychological effects of imprisonment and prison isolation explains, "At the very least, prison is painful,  and incarcerated persons often suffer long-term consequences from having been subjected to pain, deprivation, and extremely atypical patterns and norms of

---

[15]  Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006).

living and interacting with others."[16]  As to Derian's case, his stepfather, Rafael Alcantra, says it best – "[Derian] is a young man who has suffered greatly, and prison often does more damage than psychological help."  *See* Exhibit "C" (Family Letters).

As described, Derian has taken serious steps through treatment to find and experience growth and transformation.  The Court should not overlook such efforts by Derian, along with his challenging personal history, and trauma and adversities he experienced, mental health conditions and substance abuse struggles, and support from his family, solely to "send a message" to others.  As the Court is aware, the impact of general deterrence is difficult, if not impossible, to quantify.  After all, and as stated, vast amounts of research on general deterrence show that the chance of being arrested—that is, "caught"—is a substantially more powerful deterrent than the severity of punishment, or whether incarceration is part of the punishment imposed.  Multiple courts have relied on such data and research and concluded the same.[17]  At bottom, general deterrence is served by making arrests and convicting defendants of crimes that, regardless of jail sentences, cause severe and debilitating real-life consequences. In Derian's situation, the message is clear: if you engage in serious criminality, you will face a substantial sentence and be separated from your family, again.  And lastly, there is no evidence that a sentence greater than our request will drive home the message any harder or louder.

A total sentence of 120 months' imprisonment will have a more than sufficient deterrent effect on Derian.  A longer sentence will not further lower Derian's risk of recidivism.  Nor is such a sentence necessary for incapacitation.  As demonstrated by his transformative efforts at HCCC and Integrity House, Derian has changed and continues to mature and grow.   Derian's rehabilitative efforts at HCCC and acceptance of responsibility indicate that he is on a positive path and at a lower risk of committing additional crimes upon release.  And statistically, as demonstrated by numerous studies, his recidivism rate will decline as he gets older.[18]  Finally, as described in the attached letters from his mother, son, stepfather, brother and sister, they are all

---

[16] Quandt, Katie Rose and Alexi Jones. "Incarceration Can Cause Lasting Damage to Mental Health." Prison Policy Initiative.  May 13, 2021. https://www.prisonpolicy.org/blog/2021/05/13/mentalhealthimpacts/.

[17] *See, e.g.*, *United States v. Browning*, 2021 WL 795725, at *5 (E.D. Mich. Mar. 2, 2021) ("In terms of both specific and general deterrence, there is overwhelming evidence in the scientific literature that the *certainty* of being caught is a vastly more powerful deterrent than the severity of the punishment."); *United States v. Lawrence*, 254 F. Supp. 3d 441, 444 (E.D.N.Y. 2017) (accepting expert testimony that "[m]ost of the studies agree that there is very little deterrent effect associated with lengthy [] punishment"); *see also* Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 Crime & Just. 199, 201 (2013) ("[T]here is little evidence of a [] deterrent effect arising from the experience of imprisonment compared with the experience of noncustodial sanctions such as probation. Instead, the evidence suggests that reoffending is either unaffected or increased [by longer sentences].").

[18] *See, e.g.,* Travis Hirschi & Michael Gottfredson, *Age and the Explanation of Crime*, 89 Am. J. Sociology 552, 555, 580 (1983); Elizabeth Oddone Paolucci et al., Nat'l Found. For Family Research & Educ., *A Review of Marital and Family Variables as They Relate to Criminal Recidivism* 14 (Nov. 2000), http://www.csc-scc.gc.ca/research/092/r92e.pdf; Mark Ouimet & Marc Le Blanc, *The Role of Life Experiences in the Continuation of the Adult Criminal Career, 6 Criminal Behavior & Mental Health* 73, 83 (1996) (concluding that "there is a strong and significant effect of maturation that is independent of the exposure to anti-criminal institutions such as family or work"); *see also* PSR ¶ 182 ("Youthful individuals also are amenable to rehabilitation.  The age-crime curve, one of the most consistent findings in criminology, demonstrates that criminal behavior tends to decrease with age.").

committed to him and will provide ongoing support to best ensure Derian's reintegration into society.  *See* Exhibit "C" (Family Letters).

**Conclusion**

Derian accepts responsibility for his actions.  He is remorseful and recognizes the pain he has caused himself and others, including his mother and son.  With intensive treatment, he now has insight into his struggles with substance abuse.  He is also responsibly managing his mental health symptoms and experiencing healing.  Lastly, Derian has hope; hope despite the awful circumstances of his upbringing and his downward spiral following his release from federal prison in 2024.  Through treatment, he has persevered and changed and transformed.

As we have described, and cannot overstate, a total sentence of 120 months' incarceration is a stiff penalty.  It will have a direct and consequential effect on Derian.  We hope that this memorandum, along with the attached exhibits, helps this Court to meaningfully consider Derian's history of trauma and resiliency and impose a sentence that holds Derian accountable, and promotes continued rehabilitation.  For the reasons set forth above, we respectfully request that the Court impose a total sentence of 120 months' imprisonment with 5 years' supervised release.  Such a sentence is "sufficient, but not greater than necessary," based on all the factors set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

*Anthony Cecutti*

Anthony Cecutti, Esq.

# Exhibit "A"

Mitigation Report

# Exhibit "B"

Psychological Assessment

# Exhibit "C"

Honorable Judge Oetken, good morning. My name is Rafael Alcantra, and I am the stepfather, or rather, the father, of Derian del Carmen Ramirez. On this occasion, I am taking the liberty of addressing you on behalf of Derian. We are not yet related by blood, but we are bound by something much greater: the love of a true father. When I married Derian's mother, she gave me the gift of becoming the father of her children. Derian, as I observed, was a noticeably quiet and often withdrawn child, but respectful. I became his friend and always tried to guide him down the right path. Life is uncertain, but that doesn't mean Derian doesn't deserve a chance. I have worked as a bellboy in a Manhattan hotel for a little over 25 years, and the impact Derian has on my life is evident. I see day after day how his mother's health deteriorates, and mine as well, and how his son, ████, is lost in tears. Only he knows that he wants his father at home, like all the children he plays with at school. I give you my word as a man that if Derian were given a chance... It will be different, of course, with your support as the authority. He is a young man who has suffered greatly, and prison often does more damage than psychological help. I am willing to move from New York with my remaining family, and Derian, of course, so that he can start over in another place with new opportunities. My daughter is at a good university; she studies cancer. If you can understand the impact of mistreatment as a child—████████████ ████████████—it's hard to grow up like that. I don't want you to think I'm victimizing him; it's just that no human being should have to go through this. This came to light when he was older, as a man. I know it's not easy to talk about these things because of shame, and he just needs emergency help, not so much punishment. But God always sees hearts, and this is my feeling, honorable judge. Thank you for your attention. Derian is doing his part to change; he leads support groups in prison. He is very focused on moving forward, and we all eagerly await his return home so we can offer more help and set a good example of how we, as a family, take advantage of opportunities. God bless you. And have a great day!

Judge Oetken,

My name is Briancyy, the only little sister to my brother Derian. ████████████
████████████████████████████████████████

While I understand one's upbringing is no excuse for all decisions made in life, I cannot ignore the influence it does play, especially when having been subjected to unfortunate circumstances at such a young age. As of now, I am accomplishing many new milestones in my life, like currently studying for a Master's in Health Administration at Cornell University, and having my brother be a part of this new journey alongside me would be better than discussing them behind plexiglass.

My nephew ████ who is his child, also accomplished a beautiful milestone recently - being baptized at 10 years old in the name of our Lord Jesus Christ on January of this year, an event he missed out on. Our ultimate goal is to move out of New York City because we would hope to begin a new life elsewhere, away from the old troubles, with him in our midst. I would also like to see my mother have the spirit to celebrate family holidays like before, but has not have the heart to do so for the last few years because he's not there to experience it with us. I pray that you may see the heart from which I write these words and that our family can finally be restored once again.

Thank you sincerely for your time.

Best,
Briancyy Del Carmen

Dear Judge Oetken,

My name is David Delcarmen, and I am writing on behalf of my brother, Derian Del Carmen.

I want to give the Court a real picture of who Derian is from the perspective of someone who has known him his whole life. I understand he has made serious mistakes, and I am not writing to excuse them. I am writing because those mistakes are not the full story of who he is.

Derian has always cared deeply about family. As his brother, I have seen both the good in him and the struggles he has dealt with over the years. I have seen that he carries a lot mentally and emotionally, and I know those issues have affected the way he has handled life, especially during difficult periods. That does not take away responsibility for his actions, but it is part of the truth of what he has been dealing with.

What I can say honestly is that Derian is not a cold or uncaring person. He has people who love him, people who have not given up on him, and people who still see value in him. He is a father, a son, a brother, and someone whose absence will be deeply felt by the people closest to him, especially his son.

A long prison sentence will be hard on him in obvious ways, but I believe it will also weigh heavily on him mentally and emotionally. I also know it will affect our family. Even so, I will continue to support him through that time. I will stay in contact with him, encourage him to keep his mind focused in a better direction, and do what I can to make sure he still feels connected to his family and has support.

I believe Derian needs structure, continued support, and accountability. I also believe he is capable of growth. When he is eventually released, family support will matter, and I intend to be part of that support however I can.

I am not asking the Court to ignore what happened. I am only asking the Court to see Derian as a whole person and to know that he has family who loves him, believes he can do better, and will continue to stand by him.

Thank you for your time and consideration.

Sincerely,

David Delcarmen



Dear Judge Oetken, I am taking this opportunity to speak to you about my son, Derian del Carmen Ramirez. Derian is my son. My name is Sandra Ramirez. On this occasion, I address you with respect and hope you will understand a little about Derian's life. I understand that you are here to enforce the laws. Derian, since childhood, has been a child marked by contempt. And his father simply abused everyone physically and mentally in the house, especially Derian. ████████████████████████████████████ ██████████████████████████, which has had a significant impact on his life. I ask for some consideration for him. I think he needs help other than bars and deprivation of liberty. I know you can recommend a good psychological program for him so he can reintegrate into society. Derian's absence from the house is very sad. There are no Christmases, we don't celebrate Thanksgiving. Everyone in my family is very sad, especially me as his mother. I would like different treatment. Derian is polite, but I know that as human beings we make mistakes, but behaviors can also be corrected. Derian's son, ████████████, suffers a lot and needs his father. He is autistic and suffers from severe asthma. My health is being affected every day. I wake up with difficulty and see him in jail, and I know he is sorry and wants a good future. He just needs another chance. I have already planned to sell my house so that when he returns home it will be a new beginning, different places. And new opportunities, of course, Your Honor, with your help and consideration, my family is willing to help Derian in every way. We have a different plan for him to reintegrate into society, and I know this has been a learning experience for him. Everything is in God's hands; we are His children, and God knows our hearts. I am extremely grateful for your attention and apologize to society for any harm my son may have caused. I have faith that he will change with a good program. I trust in the judicial system of the United States of America; I know you understand compassion, and I understand that you are the authority. My apologies, and thank you. God bless you, Your Honor.