

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

Jacob K. Javits Federal Building
26 Federal Plaza, 37th Floor
New York, New York 10278

March 24, 2026

**BY ECF**
Honorable J. Paul Oetken
United States District Judge
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

> Re:    *United States v. Derian Del Carmen*, S2 24 Cr. 601 (JPO)
> *United States v. Derian Del Carmen*, 18 Cr. 669 (JPO) (VOSR)

Dear Judge Oetken:

The Government submits this letter in advance of the sentencing of the defendant, Derian Del Carmen, on March 31, 2026, for a criminal conviction and related violation of supervised release. This Court first sentenced Del Carmen in May 2021, after his convictions by guilty plea for attempted assault with a dangerous weapon in aid of racketeering and firearms possession in furtherance of a drug trafficking crime. *See* Judgment, Dkt. 263, *United States v. Del Carmen* et al., No. 18 Cr. 669 (S.D.N.Y. May 21, 2021). Del Carmen argued for and received a mandatory minimum 60-month sentence. *See id.* Just six months after his release, Del Carmen was arrested as he sat guard in a car with three loaded handguns and a dealer's variety of drugs packaged for street distribution. For the reasons set forth below, the Government respectfully submits that a sentence at the top end of the Guidelines range—135 months' imprisonment for the armed drug offense, and a consecutive 33 months' imprisonment for the near-immediate and egregious violation of supervised release—would best serve the purposes of sentencing.

## I.  Background

### A.  Del Carmen's 2021 Gang Assault and Firearms Convictions

As least as recently as 2019, Del Carmen was a member and associate of the 2200 Block Crew, a "criminal gang operating out of an apartment building in the southwest Bronx" that was "engaged in, among other activities, acts involving murder, robbery and narcotics trafficking." *See* PSR ¶¶ 32, 52, 53, *United States v. Del Carmen* et al., No. 18 Cr. 669 (the "2021 PSR"). During a six-month period of the investigation that ultimately led to Del Carmen's first federal indictment, Del Carmen sold approximately $3,000 worth of crack and heroin to law enforcement officers, *see* Dkt. 261 at 1, and carried a firearm while dealing drugs for his gang. *See* 2021 PSR ¶ 61.

On June 19, 2018, Del Carmen and two other gang members assaulted another person in an attack on Morris Avenue between 181st Street and 182nd Street that was caught on surveillance video. *Id.* ¶¶ 10, 53. Del Carmen and the two other attackers "repeatedly punched and kicked" their victim, who was also stabbed. *Id.* ¶ 53.

Nine months later, in March 2019, Del Carmen "was involved in a shooting." *Id.* ¶ 52. Just after 5:00 that afternoon, Del Carmen joined an attack on "a member of a rival drug trafficking crew" near 182nd Street and Grand Concourse in the Bronx, standing beside an associate who shot at their victim "near a subway entrance." *Id.* ¶ 41.

Del Carmen was arrested and detained the next month, in April 2019. *Id.* ¶ 55. A grand jury indicted him on charges of racketeering conspiracy, assault and attempted murder in aid of racketeering, attempted assault and murder in aid of racketeering, firearms possession in furtherance of that crime of violence, conspiracy to distribute crack, powder cocaine, and heroin, and firearms possession in furtherance of that drug trafficking crime. *See id.* ¶ 1–17; *see also* S1 18 Cr. 669 (JPO).

In December 2020, Del Carmen pleaded guilty pursuant to a plea agreement to two counts: attempted assault with a dangerous weapon in aid of racketeering, 18 U.S.C. § 1959(a)(6), and firearms possession in furtherance of a drug crime, 18 U.S.C. § 924(c).

This Court conducted a sentencing proceeding on May 21, 2021. The Government recommended a sentence within the Guidelines range of 84 to 90 months' imprisonment, emphasizing the seriousness of Del Carmen's armed drug dealing while acknowledging that there was "reason to believe Del Carmen's family will stand by him and assist in his rehabilitation once he is released." Dkt. 261 at 5. The Probation Office recommended a sentence of 72 months' imprisonment, one year beyond the mandatory minimum term to account for Del Carmen's violent crimes but one year below his Guidelines range in light of their "hope that he is able to reintegrate successfully back into society with mental health treatment and legal and verifiable employment or continued higher education." 2021 PSR at 30. Del Carmen sought the mandatory minimum sentence in view of childhood traumas, medical conditions that were inadequately addressed during his pretrial detention, his struggle with substance abuse issues, family support as a safeguard against recidivism, and his need to care for and be with his son. *See* Dkt. 286 (Sent'g Tr.) at 8–11. Addressing the Court before its imposition of sentence, Del Carmen promised to turn his life around: "All I could say is you guys will see my name, and I will make something out of my life. So remember my name, I will be somebody. I promise that." *Id.* at 12–13.

The Court imposed the mandatory minimum sentence of five years' imprisonment. Its statement of reasons began by acknowledging Del Carmen's argument that he had "the basis to get back and start a life and become somebody, like you just said." *Id.* at 13. After describing the seriousness of Del Carmen's offenses, the Court discussed various mitigating factors, including the conditions of Del Carmen's pretrial confinement at the MCC in the runup to and during the COVID-19 pandemic. *See id.* at 13–16. The Court also imposed a three year term of supervised release. *Id.* at 16.

### B. <u>Del Carmen's Almost Immediate Recidivist Gun-and-Drug Crime</u>

Del Carmen completed his term of imprisonment and began his term of supervised release on January 12, 2024. *See* July 24, 2024 Request for Warrant ("VOSR Report"). His rehabilitation plan included residing with his family and participating in intensive mental-health and substance-abuse treatment. Four months into his supervised release, and one month after testing positive for marijuana, oxycodone, and oxymorphone, Del Carmen stopped attending his court-ordered treatment. *See* VOSR Report at 2. That same month, Del Carmen skipped out on a resume-writing class arranged for him by the Probation Office. *See id.* In early June 2024, Del Carmen failed to report to Probation for employment assistance and referrals. *See id.* On June 30, 2024, Del Carmen told his Probation Officer that he had left his family's house after a dispute with his mother and was living in a friend's car near East 180th Street and Anthony Avenue in the Bronx. *See id.* Two days later, Del Carmen ignored Probation's directive to report to their office to discuss and address his housing situation. *See id.*

Several weeks later, Del Carmen was arrested after stepping out of a car parked near East 180th Street and Anthony Avenue. *See* 2025 PSR ¶ 8. NYPD officers approached him after seeing him drop items to the ground and walk away from the car as they neared. *See id.* They arrested Del Carmen after seeing apparent drugs in plain view through the car's front passenger window, near the seat where Del Carmen had been sitting alone in the car. *See id.* Two loaded handguns were later recovered under that same front passenger seat. *See id.* ¶ 11. Another loaded handgun was found in a small backpack in the car's back seat. *See id.* Substances from inside of the packages that Del Carmen had dropped to the ground, and from other packages found inside of the car, included fentanyl, cocaine, heroin, and methamphetamine in containers prepared for street-level distribution.

As he sat guard in a car with three loaded guns and drugs packaged for street sales that night in July 2024, Del Carmen was little more than two blocks from the subway entrance where he attacked, and a fellow gang member shot at, another rival in March 2019, *see* 2021 PSR ¶¶ 41, 52, and less than four blocks from where he and fellow gang members beat and stabbed a rival in June 2018, *see id.* ¶¶ 10, 53.

### C. <u>Del Carmen's 2024 Charges and 2025 Guilty Plea</u>

On October 16, 2024, pending the confirmation of results from a drug-testing laboratory, a grand jury returned an indictment charging Del Carmen with possessing a firearm after a felony conviction. *See* Dkt. 8, No. 24 Cr. 601 (JPO). On November 4, 2024, a grand jury returned a superseding indictment charging Del Carmen in two counts with narcotics distribution, in violation of 21 U.S.C. § 841(b)(1)(C), and with possessing a firearm in furtherance of that drug trafficking crime, in violation of 18 U.S.C. § 924(c). *See* Dkt. 11, No. S1 24 Cr. 601. Because Del Carmen had previously been convicted of violating Section 924(c), his successive violation carried a mandatory minimum term of 25 years' imprisonment. *See* 18 U.S.C. § 924(c)(1)(C)(i).

On June 24, 2025, Del Carmen pleaded guilty, pursuant to a plea agreement, to a one-count superseding information charging conspiracy to distribute 280 grams and more of cocaine base, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A). *See* 2025 PSR ¶ 1. Del Carmen also admitted to

the related violations of his terms of supervised release. *See id.* In the plea agreement, Del Carmen stipulated that (among other things) his drug crime involved the possession of a firearm, *see id.* ¶ 23, and that his Guidelines range was 120 to 135 months' imprisonment for his criminal count (by operation of the drug crime's 10-year mandatory minimum sentence) and a consecutive 27 to 33 months' imprisonment for his violations of supervised release. *See* Plea Agreement at 1–2.

The Probation Office recommends a sentence of 120 months' imprisonment for Del Carmen's drug conviction. 2025 PSR at 30. In July 2024—before the initiation of the instant criminal case—the Probation Office recommended a sentence of 24 months' imprisonment for Del Carmen's related violations of supervised release. *See* 2024 VOSR Report at 6.

## II.  Applicable Law

While advisory following *United States v. Booker*, 543 U.S. 220 (2005), the Sentencing Guidelines remain "the starting point and the initial benchmark" for sentencing proceedings. *Gall v. United States*, 552 U.S. 38, 49 (2007). That is because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Id.* at 46. For that reason, "in the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances." *United States v. Fernandez*, 443 F.3d 19, 27 (2d Cir. 2006).

In imposing a sentence, the Court must consider the factors set forth at 18 U.S.C. § 3553(a), which include the "the nature and circumstances of the offense and the history and characteristics of the defendant," *id.* § 3553(a)(1), and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," *id.* § 3553(a)(6). The factors also include the "need for the sentence imposed"

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

*Id.* § 3553(a)(2).

After revoking a term of supervised release, a "court may, after considering the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), (a)(6), and (a)(7)" impose a term of imprisonment. 18 U.S.C. § 3583(e). "A sentence for a violation of supervised release should primarily sanction the defendant's breach of trust, not the conduct constituting the violation itself." *United States v. Ramos*, 979 F.3d 994, 1002 (2d Cir. 2020). Because sentencing for violations of supervised release serves this distinct purpose, the Guidelines' policy statement provides that a "term of imprisonment imposed upon the revocation of . . . supervised release shall

be ordered to be served consecutively to any sentence of imprisonment that the defendant is serving, whether or not the sentence of imprisonment being served resulted from the conduct that is the basis of the revocation of ... supervised release." U.S.S.G. § 7B1.3(f).  While this statement is advisory, the Second Circuit "has repeatedly upheld the substantive reasonableness of revocation sentences that were imposed consecutive to sentences for the underlying criminal conduct." *United States v. Reynoso*, No. 24-214, 2025 WL 1793410, at *2 (2d Cir. June 30, 2025) (collecting cases).

### III. The Court Should Impose a Sentence of 168 Months' Imprisonment

Almost five years to the day of his forthcoming sentencing, Del Carmen stood before this Court convicted of an armed drug crime and sought leniency with a promise to change.  The Court gave him that chance.  But just months after completing the first meaningful term of imprisonment in his life, Del Carmen was once again an armed drug dealer.  This time as last, Del Carmen calls to the Court's attention the traumas and hardships that have marked his life—supplemented with the promising success he has had participating in rehabilitative programs under the strictures of custodial detention.  Those facts justify a sentence far less than the mandatory minimum that could have been imposed for Del Carmen's successive violation of Section 924(c)'s prohibition on armed drug trafficking—a charge to which he had no viable defense.  But Del Carmen's brazen breach of this Court's trust after it last imposed a lenient sentence—and his near-immediate willingness to return to the same turf, to commit the same armed drug crimes—counsels in favor of a sentence that reasonably exceeds the minimum this Court can impose for his repeat offense.

Recidivist armed drug dealing while on supervised release is among the most serious crimes for which this Court can impose sentence.  *See* 18 U.S.C. § 3553(a)(1) (compelling consideration of "the nature and circumstances of the offense").  The clinical legal language of Del Carmen's objections to the PSR obscure the undeniable harm of his conduct.  He disputes "actually" possessing loaded guns as part of "any current gang affiliation"—he only "constructively" possessed the firearms with "others."  PSR at 28.  Del Carmen's quasi-denials can be taken for whatever the Court deems them worth.  The undisputed facts are that Del Carmen possessed loaded handguns, as the sole occupant of a car that was quite clearly set up for dealing drugs, just blocks away from where he had recently been involved in multiple group assaults (including one that involved a shooting) in service of a street gang.  Del Carmen's own "history and characteristics," *see* 18 U.S.C. § 3553(a)(1), underscore that the harm of possessing guns while dealing drugs is much more than theoretical.  It is only by luck or happenstance that Del Carmen, sitting alone in a car with three loaded guns shortly after the stabbing deaths of two close friends, *see* Def. Sub. at 2, was not involved in another instance of drug-related, turf-protecting violence.

While Del Carmen's struggles with his own drug use are a relevant part of his "history and characteristics" that the Court must consider, a clear-eyed look at the circumstances of Del Carmen's offense makes plain that he was not an addict surrounded by his own supply but a dealer operating out of an organized crew's armed mobile stash house.  While Del Carmen used marijuana and also tested positive for oxycodone and oxymorphone shortly before his arrest, the car (and Del Carmen's own hands) held crack cocaine, powder cocaine, fentanyl, heroin, and methamphetamine—a full menu of drugs, packaged for street sales.  (Indeed, Del Carmen

"object[ed] to the [PSR's] characterization" that he was living out of this car.  PSR at 28.  It was a place of deadly business, not a drug user's refuge.)

In May 2025, Del Carmen was moved from the MDC to the facility in Hudson County, New Jersey, less than two months after his counsel first raised issues with his experience at the federal jail in Brooklyn.  It is clear that, under the rigid structure imposed by pretrial detention, Del Carmen has enjoyed promising success with treatment for his illnesses.  And Del Carmen's lack of sanctions for misconduct in his ten months at Hudson County is encouraging, if tempered by his considerable disciplinary record in his shorter time at the MDC.  *See* 2025 PSR ¶ 4 (cataloguing Del Carmen's five disciplinary violations at MDC between November 2024 and April 2025, including three for assault or threatening bodily harm).  But this recent record of success under custodial conditions does not justify the degree of leniency that Del Carmen once again seeks.  *Cf. United States v. Duarte*, No. 99 Cr. 192 (CSH), 2025 WL 1434886, at *6 (S.D.N.Y. May 19, 2025) (denying motion for sentence reduction because, among other things, "maintain[ing] clean disciplinary records and engag[ing] in self-improvement opportunities like prison programming" is "expected," not "extraordinary").

In 2021, this Court imposed the mandatory minimum sentence on Del Carmen—varying downward from a Guidelines range of 84 to 90 months' imprisonment "partly because [it] hoped you mean it when you say you're going to change your life and we're going to hear good things about you.  I hope that's right."  Dkt. 286, No. 18 Cr. 669, at 16.  In imposing that sentence, the Court extended its trust and gave Del Carmen a chance to honor it.

That prior leniency was spurned.  Del Carmen returned to the site of his prior crimes.  He sat guard in a car with loaded guns and the drugs that were sold to finance their dealers' domination of that turf.  He thought about friends who had recently been stabbed to death.  It is evident what easily could have happened next.  The community is fortunate that police officers happened to come across Del Carmen that night, intervening to separate him from guns and drugs before another shooting or another stabbing could tear at the neighborhood's fabric.  Del Carmen will not be sentenced to anywhere near his crime's statutory maximum, nor even anywhere near the minimum term of imprisonment that Congress required for successive convictions of the armed drug trafficking statute.  But his particularly egregious recidivism makes his drug conspiracy offense worse than its typical occurrence.  For that reason, its mandatory minimum term of imprisonment would be insufficient "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."  18 U.S.C. § 3553(a)(2)(A).

## IV. <u>Conclusion</u>

For these reasons, the Government respectfully recommends a sentence of 168 months' imprisonment—at the top of the Guidelines range for Del Carmen's recidivist armed drug dealing offense and for his extraordinary breach of the Court's trust while committing it at the very outset of his supervised release.

Respectfully submitted,

JAY CLAYTON
United States Attorney

By: _____
Justin Horton
Adam Z. Margulies
Jun Xiang
Assistant United States Attorneys
Southern District of New York
(212) 637-2276 / -2345 / -2289

cc:    Anthony Cecutti, Esq.